Urban B. LUETKEMEYER et al.,
Plaintiffs,

v.

Harold KAUFMANN et al., Defendants.
No. 1703.

United States District Court,
W. D. Missouri, C. D.

Sept. 24, 1973.

Thomas J. Downey, Louis C. DeFeo, Jr., Jefferson City, Mo., for plaintiffs.

John C. Danforth, Atty. Gen., D. Brook Bartlett, Asst. Atty. Gen., John W. Inglish, Carson, Inglish, Monaco & Coil, Jefferson City, Mo., for defendants.

Before GIBSON, Circuit Judge, and COLLINSON and OLIVER, District Judges.

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND FINAL JUDGMENT DENYING RELIEF PRAYED FOR BY PLAINTIFFS**

JOHN W. OLIVER, District Judge.

I.

Plaintiffs challenge those statutes of the State of Missouri which provide for transportation of public school pupils to and from school but which do not provide like transportation for the pupils of church-related schools. Plaintiffs contend that this denial of transportation violates particular provisions of the United States Constitution. We disagree.

Plaintiffs Urban Luetkemeyer and his children reside in the Cole County, Missouri, R-III School District. That school district transports to and from school at public expense children attending the public school. It refused, however, to transport plaintiffs' children to and from St. Martin's School, which is operated by the local parish of the Catholic Church and which they attend. That refusal was based upon the absence of any specific statutory authority to expend public funds for such transportation; upon provisions of the Missouri Constitution prohibiting the use of state funds, directly or indirectly, in aid of religion or religious institutions; and upon the decision of McVey v. Hawkins, 364 Mo. 44, 258 S.W.2d 927 (1953), which declared that the expenditure of public funds for the transportation of school children was not lawful under the Constitution and laws of the State of Missouri.

The plaintiffs contend that the transportation of school children is a public service primarily benefiting children and their parents and not parochial schools. The denial of that benefit, plaintiffs contend, results in an arbitrary and capricious classification which unconstitutionally denies plaintiffs equal protection of the laws, denies plaintiffs of liberty without due process of law, in that it forces them to forego the exer-

cise of their right to freely exercise their religion in order to secure a public benefit, and penalizes the free exercise of religion in violation of the First Amendment to the Constitution.

The basic questions presented are whether the State of Missouri, once it determines to provide bus transportation only to public school students, is compelled by the Constitution of the United States to also provide like transportation to students who attend a parochial school; and whether the Missouri law which does not so provide must be declared to be repugnant to the Federal Constitution.

The relevant facts were wholly stipulated. Our findings of fact therefore quote or paraphrase the stipulation of the parties.

## II. FINDINGS OF FACT

1. The plaintiffs are Urban Luetkemeyer and his children, Kennan and Jacqueline, ages 14 and 10, respectively. The Luetkemeyers live in a rural area of Cole County, Missouri, adjacent to U. S. Highway 50. Their home is approximately 200 yards from the highway.

2. The Luetkemeyers are members of the Catholic Church and the Luetkemeyer children attend St. Martins School which is operated by St. Martins Parish of the Catholic Church. The school is located in the unincorporated village of St. Martins on U.S. Highway 50, approximately 2 miles west of the Luetkemeyer home. St. Martins School is an elementary school which offers a curriculum for grades 1 through 8. It would violate the religious conscience of Urban Luetkemeyer to send his children to public schools for their education as long as a Catholic church-related school is available on a day school basis for the education of his children.

3. Cole County R-III School District is a public school district which operates an elementary school in Centertown, a village located on U. S. Highway 50, approximately 7 miles west of the Luetkemeyer home. Both St. Martins School and the Luetkemeyer home are within the boundaries of Cole County R-III School District. During the 1970–1971 school year, there were 207 children enrolled in grades 1 through 8 in attendance at Cole County R-III School. During the 1970–1971 school year there were 205 children enrolled in grades 1 through 8 in St. Martins School.

4. Local public school districts with the assistance and cooperation of the State of Missouri through the State Board of Education must provide transportation to and from home and school for all children living more than 3½ miles from school and may provide transportation for all children living one mile or more from school pursuant to Section 167.231, R.S.Mo., 1969, V.A.M. S. The expense of the transportation is paid by state funds and local funds derived from state and local taxes pursuant to Sections 162.161 and 167.251, R.S. Mo., 1969, V.A.M.S.

5. Cole County R-III School District with the assistance and cooperation of the State Board of Education has established and operates a system of school bus transportation to and from home and school for children who attend the public school maintained and operated by the district. Free transportation is offered to all children who live one mile or more from school. During the 1970–1971 school year, the average daily number of children enrolled in grades 1 through 8 of the Cole County R-III School District who were transported to and from home and school was 130.35. Five buses with passenger capacity ranging from 66 to 48 passengers each and four other vehicles with the capacity of 12 passengers each are operated by the district for the transportation of children to and from school. Cole County R-III School District was reimbursed by the State of Missouri for all of the total cost of providing said transportation (except for $126.96, which was the cost of transporting two pupils who were not eligible for state transportation).

6. In 1970 Urban Luetkemeyer paid more than $985.00 in real and personal

property taxes to Cole County, more than $625.00 in income taxes to the State of Missouri, and more than $250.-00 in sales taxes to the State of Missouri. As the owner and operator of a retail business establishment, he collected from his customers and paid to the State of Missouri more than $4,250 in sales taxes in 1970. The income taxes and sales taxes paid by Urban Luetkemeyer and the sales taxes collected by him from his customers have been paid to the State of Missouri and deposited in the General Revenue Fund of the State of Missouri, and a portion of that fund has been appropriated to the Public School Fund of the State of Missouri. A portion of the Public School Fund has been allocated and paid to the Cole County R-III School District in reimbursement of the cost of providing pupil transportation as set forth above.

7. A school bus route established and operated by the Cole County R-III School District passes by a point on U.S. Highway 50 which is approximately 200 yards from the Luetkemeyer home and continues on U. S. Highway 50 and passes directly by St. Martins School which is attended by the Luetkemeyer children. The Luetkemeyers have demanded of the members of the Cole County R-III School Board that transportation be provided to the Luetkemeyer children to and from their home and St. Martins School on the existing facilities and routes operated and maintained by Cole County R-III School District. On January 12, 1971, the Luetkemeyers made an unsuccessful effort to board a Cole County R-III bus for transportation to St. Martins School. The school district's officers and employees have refused to allow the Luetkemeyer children to use the school district bus facilities for the purpose of going to and from St. Martins School from the Luetkemeyer home. The officials of Cole County R-III School District refused to allow the Luetkemeyer children to use the bus facilities in going to and from St. Martins School for the reason that in their opinion the law of the State of Missouri prohibits the transportation at public expense of children to and from a non-public school. The school district is supported in its refusal to provide transportation of children going to and from a non-public school by the Executive Department of the State of Missouri in its administration of the statutes, by the Judicial Department of the State of Missouri in its interpretation of the statutes, and by the Legislative Department of the State of Missouri in its appropriation of tax moneys to fund the transportation of children to and from home and school.

8. The route which the Luetkemeyer children must follow in going to and from home and St. Martins School is on U.S. Highway 50 in a rural area. There are no paved sidewalks or walkways, traffic control devices, and protected pedestrian crosswalks on the route. There are generally no sidewalk or walkways, traffic control devices and protected pedestrian crosswalks on the streets, roads and highways through the Cole County R-III School District. The average daily traffic on the route is 5,650 vehicles.

9. St. Martins School is a nonprofit school operated by St. Martins Parish of the Catholic Church. The sole source of income for the school is the contributions and donations from patrons and friends and fees charged its pupils.

10. The St. Martins School does not provide transportation to and from home and school. The parents or guardians of the children have the sole responsibility of getting the children to and from school. Approximately 100 children attending St. Martins School live more than one mile from that school and if transportation were provided to children attending St. Martins on the same basis as is provided to children attending Cole County R-III School, approximately 100 children would be eligible for transportation. Most of the children attending St. Martins School who live one mile or more from the school are located along existing school bus routes.

11. The free transportation provided to children who attend Cole County R-

III Public School aids the parents and guardians of these children in complying with the requirements of the Compulsory Attendance Law. This free transportation also relieves the parents and guardians of these children of the cost and expense of transportation to and from school. The parents and guardians of children who attend St. Martins School are denied the benefit · of free transportation in complying with the requirements of the Compulsory Attendance Laws and are burdened with the cost and expense of transporting their children to and from school.

12. School bus transportation is a safer means for pupils to travel to school than private vehicle or pedestrian travel. The evidence shows that buses are subject to statutory and regulatory safety standards to which private vehicles are not subject, school bus traffic is governed by special traffic control requirements, and school bus drivers are subject to special qualification standards. The probability of accident and injury in going to and from school for pedestrian pupils increases with the distance the pupils must travel between home and school, given a certain community with certain hazards of pedestrian travel.

13. The total estimated expenditure for public elementary and secondary education in the State of Missouri in 1970–1971 is $875,300,000. During the 1970–1971 school year the total cost of transporting pupils enrolled in grades Kindergarten through 12, inclusive, of public schools in the State of Missouri by public school districts was $33,-028,006, or 3.7% of total expenditure for public schools. The average cost per pupil for transportation was $66.72.

14. The total cumulative enrollment in public schools, grades Kindergarten through 12, inclusive in the State of Missouri for the 1970–1971 school year was 1,084,833 pupils. During the 1970–1971 school years the number of pupils enrolled in Grades Kindergarten through 12, inclusive, of public schools and transported at one time or another by public school districts in Missouri was 585,650. During the 1970–1971 school year the average daily number of pupils enrolled in Grades Kindergarten through 12, inclusive, of public schools transported by public school districts in the State of Missouri was 495,024. Therefore, 45.6% of the public school pupils were transported.

15. Based upon data reported to the State Department of Education under the Elementary and Secondary Education Act of 1965, the total number of nonpublic schools in Missouri during the 1969–1970 school year was 553, which number was composed of 385 Catholic schools, 80 Lutheran schools, 3 Jewish schools, 12 Amish schools, 10 Seventh Day Adventist schools, and 63 other nonpublic schools. Based upon data reported to the State Department of Education under the Elementary and Secondary Education Act of 1965, the total number of nonpublic school pupils during the 1969–1970 school year was 134,593, which number was composed of 116,213 pupils attending Catholic schools, 10,844 pupils attending Lutheran schools, 235 pupils attending Jewish schools, 242 pupils attending Seventh Day Adventist schools, and 7,059 pupils attending other nonpublic schools. These figures are based upon reports from 85% of the nonpublic schools. Of the schools reporting, 94.8% of students attending nonpublic schools are attending church-related schools.

16. As noted above, 45.6% of the children attending public schools in the State of Missouri during the 1970–1971 school year were transported. If the same percentage of children attending nonpublic schools in Missouri would be eligible for transportation, the estimated average daily number of children attending nonpublic schools to be transported would be 61,374. The estimated maximum cost of transporting nonpublic school children, based upon the average cost per child of transporting public school children would be $4,094,872 per year.

The total estimated expenditures for public elementary and secondary education in the State of Missouri in 1970–1971 was $875,300,000. The estimated cost of transporting nonpublic school children to and from school would be less than ½ of 1% (0.46%) of the total annual expenditure for public elementary and secondary education.

17. The transportation of children to and from both public and nonpublic schools at public expense is provided for in 27 states. The 1970–1971 public school enrollment in these states was 30,759,554. The 1970–1971 enrollment in Catholic schools in these states was 3,693,818. Twenty-three states do not provide transportation at public expense for children going to and from nonpublic schools. The public school enrollment in these states for 1970–1971 was 16,708,281. The 1970–1971 enrollment in Catholic schools in these states was 624,978.

## III. CONCLUSIONS OF LAW

### A. *Child Benefit Theory*

■ Plaintiffs place great reliance on the "child benefit theory" spelled out in Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1946); Board of Education v. Allen, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968), and other cases. Those cases concluded that States may constitutionally provide particular services to pupils attending religious schools (school bus transportation and school textbooks, respectively) on the theory that such services were for the benefit of the "parents and children, not schools," *Allen, supra*, at 392, 88 S.Ct. 1923. Those cases, however, did not relate to the question presented in this case. Principles which state what a State *may* do may not properly be read as a command to what a State *must* do.

Norwood v. Harrison, 413 U.S. 455, 462, 93 S.Ct. 2804, 2809, 37 L.Ed.2d 723 (1973), noted that "appellees intimate that the State *must* provide assistance to private schools equivalent to that it provides to public schools without regard to whether the private schools discriminate on racial grounds." In response, the Court stated:

Clearly, the State need not. Even as to church-sponsored schools whose policies are nondiscriminatory, any absolute right to equal aid was negated, at least by implication, in Lemon v. Kurtzman, 403 U.S. 602, [91 S.Ct. 2105, 29 L.Ed.2d 745] (1971).

See also footnote 7 in *Norwood* in which the Court explains in detail how appellees in that case, as plaintiffs in this case, "misperceive the 'child benefit' theory of our cases decided under the Religion Clauses of the First Amendment."

■ The "child benefit" theory must be considered in the context of the cases which required the Court to define permissible areas of State aid to religious institutions. The language of those cases may not be taken out of context to support the notion that a State *must* provide transportation for all pupils, regardless of whether they attend a religious or public school. We do not suggest that the fact that state benefits are distributed to children rather than to schools, and the fact that the benefit is essentially nonreligious in character may not be relevant in regard to proper analysis of other constitutional questions presented in this case; we conclude only that the "child benefit theory," as set out in *Everson* and *Allen,* standing alone, does not support plaintiffs' basic contention.

### B. *Equal Protection*

Plaintiffs contend that the transportation of school children is part of a comprehensive statutory and regulatory scheme designed to provide for the safety and welfare of children traveling to and from school. Plaintiffs argue that the fact that this public service is denied to the plaintiff children solely because they are enrolled in a nonpublic school "is an arbitrary and unreasonable classification and unconstitutionally de-

nies plaintiffs equal protection of the laws" as prohibited by the Fourteenth Amendment to the Constitution of the United States. Plaintiffs argue further that the classification involved is invidious because it infringes upon plaintiffs' fundamental right to select the school of their choice and to freely exercise their religion and that, therefore, a compelling state interest must be shown to justify the classification.

The plaintiffs direct attention to language in Shapiro v. Thompson, 394 U.S. 618, 634, 89 S.Ct. 1322, 1331, 22 L.Ed.2d 600 (1969), which states that "any classification which serves to penalize the exercise of [a constitutional] right, unless shown to be necessary to promote a compelling governmental interest, is unconstitutional." The constitutional right claimed is the right to attend a church-sponsored school, as defined in Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925). Plaintiffs in this case, as appellees in Norwood v. Harrison, fail to recognize the limited scope of *Pierce*. In *Norwood*, appellees suggested that "the rights of parents under *Pierce* would be undermined were the lending of free textbooks denied to those who attend private schools—in other words, that school children who attend private schools might be deprived of the equal protection of laws were they invidiously classified under the state textbook loan program simply because their parents had exercised the constitutionally protected choice to send their children to private schools." 93 S.Ct. at 2809.

Chief Justice Burger pointed out in *Norwood* that *Pierce* "said nothing of any supposed right of private or parochial schools to share with public schools in state largesse, on an equal basis or otherwise." He added:

It has never been held that if private schools are not given some share of public funds allocated for education that such schools are isolated into a classification violative of the Equal Protection Clause. It is one thing to say that a State may not prohibit the maintenance of private schools and quite another to say that such schools must, as a matter of equal protection, receive state aid. 93 S.Ct. at 2809.

San Antonio Independent School District v. Rodriquez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), which held that education was not a federally protected constitutional right, was cited and relied upon in *Norwood*. If one's right to a public school education is not within the protection of the Constitution, certainly it cannot be said that one has a federally protected constitutional right to a parochial school education, nor a federally protected constitutional right to receive free public transportation to and from parochial schools.

In regard to the appropriate standard to be applied in a case involving public education *Rodriquez* concluded that "this is not a case in which the challenged state action must be subjected to the searching judicial scrutiny reserved for laws that create suspect classifications or impinge upon constitutionally protected rights." 93 S.Ct. at 1300.

We conclude, consistent with the rationale of *Rodriquez*, that the proper standard to be applied is the traditional test set out in McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961): "The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective." Plaintiffs therefore have the burden of showing that the classification does not reasonably promote a valid State objective. Plaintiffs must establish as a matter of law that the State of Missouri's decision to promote the separation of church and state by refusing to provide school bus transportation to church-sponsored school pupils when it does provide that service to public school pupils is irrational, arbitrary, and capricious. We find and conclude that the State's classification is not irrational, but promotes a legitimate State purpose.

Missouri has a long history of maintaining a very high wall between church and state. Much of that history is reviewed in Harfst v. Hoegen, 349 Mo. 808, 163 S.W.2d 609 (en banc, 1942), a case cited in footnote 7 in one of the concurring opinions in Lemon v. Kurtzman, 411 U.S. 192, 93 S.Ct. 1463, 36 L. Ed.2d 151 (1973). That case reviewed the numerous constitutional provisions relating to the separation of church and state and pointed out that Missouri's Constitution "goes even farther than those of some other states." That case concluded:

> The constitutional policy of our State has decreed the absolute separation of church and state, not only in governmental matters, but in educational ones as well. Public money, coming from taxpayers of every denomination, may not be used for the help of any religious sect in education or otherwise. [163 S.W.2d at 614]

The Constitution of Missouri, Section 5, Art. IX, V.A.M.S. provides that tax revenues for schools "shall be faithfully appropriated for establishing and maintaining free public schools, and for no other uses or purposes whatsoever." In McVey v. Hawkins, 364 Mo. 44, 258 S. W.2d 927 (1953), the Supreme Court of Missouri, en banc held that the transportation of children attending private schools provided in Section 165.140, R. S.Mo., 1949, was prohibited by the Constitution of Missouri, 1945. In the general revision of Missouri school laws in 1963, the statute providing for the transportation of private school pupils was deleted. The current school laws relating to transportation, Section 167.-231 et seq., R.S.Mo., therefore, can only be interpreted as permitting transportation only to public school pupils. Missouri, therefore, does have an avowed purpose to prevent State aid to church-sponsored schools.[1]

A three-judge district court in the Eastern District of Missouri held that this purpose, when implemented to prohibit the use of public funds for private schools, was legitimate and constitutional in Brusca v. State of Missouri ex rel. State Board of Education, 332 F.Supp. 275 (E.D.Mo., 1971), aff'd. 405 U.S. 1050, 92 S.Ct. 1493, 31 L.Ed.2d 786 (1972). Plaintiff in that case made the argument that failure to provide funding out of tax revenues for private schools while providing such funding for public schools was violative of the Equal Protection Clause. The court did not find the argument persuasive:

> We find nothing arbitrary or unreasonable in the determination of the State to deny its funds to sectarian schools or for religious instruction. So long as no invidious discrimination exists, the courts may not interfere. Cf. McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393. Here, there is no discrimination in the legal sense. All children of every or no religious denomination have the same right to attend free secular public schools maintained with tax funds. The fact that a child or his parent for him voluntarily chooses to forego the exercise of the right to educational benefits provided in the public school systems does not deprive him of anything by State action. [332 F.Supp. at 279].

Plaintiffs base a large portion of their argument on their reading of Everson v. Board of Education, *supra*, and Board of Education v. Allen, *supra*.

The Court's discussion of those cases in Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), and its most recent church and state cases, Norwood v. Harrison, 413 U.S. 455, 93 S.Ct. 2804, 37 L.Ed.2d 723 (1973); Levitt v. Committee for Public Education and Religious Liberty, 413 U.S. 472, 93

---

1. Most recently the Supreme Court of Missouri has held in McDonough v. Aylward, 500 S.W.2d 721, (July 16, 1973), that it is not a violation of either the First or the Fourteenth Amendment of the United States Constitution to change the plaintiffs with the payment of taxes that are used only for public schools and not for the church-sponsored school to which he sends his children.

S.Ct. 2814, 37 L.Ed.2d 736 (1973); Sloan v. Lemon, 413 U.S. 825, 93 S.Ct. 2982, 37 L.Ed.2d 939 (1973); Committee for Public Education and Religious Liberty v. Nyquist, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973); and Lemon v. Kurtzman, 411 U.S. 192, 93 S. Ct. 1463, 36 L.Ed.2d 151 (1973), make further discussion of the equal protection question redundant.

### C. *Due Process*

Three of the six points of plaintiffs' brief purport to present due process questions. Plaintiffs contend that they were denied due process (a) "for the reason that in order to obtain the benefits of this public service (transportation of school children) plaintiffs must wholly forego their fundamental constitutional right to select the school of their choice;" (b) "for the reason that the State conditions the receipt of the benefits of this public service (transportation of school children) upon plaintiffs' foregoing the fundamental constitutional right to free exercise of their religion;" and (c) for the reason that the denial to plaintiffs of bus service "on an equal basis with other citizens constitutes the arbitrary taking of his property without compensation and deprives him of his property without due process of law."

Plaintiffs cite and rely primarily on their reading of Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); and Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). The cases upon which plaintiffs place principal reliance make clear that the due process label which plaintiffs place on the arguments made under these three points is quite incidental and that plaintiffs' reference to due process more or less follows the pattern apparently followed in Two Guys v. McGinley, 366 U.S. 582, 81 S.Ct. 1135, 6 L.Ed.2d 551 (1961). That case involved an equal protection attack upon Pennsylvania's Sunday closing law. Plaintiffs' contentions were summarized on page 589, 81 S.Ct. on page 1139, and the Court noted in footnote 5 on that page that "concomitantly, appellant states the statute violates due process for these same reasons." Regardless of what label may be placed on plaintiffs' argument, it is clear that the rationale of the cases relied upon do not afford plaintiffs any ground for relief.

The foundation upon which plaintiffs' school choice argument rests is that *Pierce* either created or recognized the notion that the constitutional prohibition which voids a state requirement that all children attend a public school commands a further conclusion that there is something in the Constitution which requires that all services, specifically, bus transportation, which the State may decide to furnish public school pupils must also be furnished parochial school pupils.

*Pierce,* in our judgment, cannot be so broadly read. Indeed, the Court in Norwood v. Harrison stated that "the Court's holding in *Pierce* is not without limits." Indeed, *Norwood* expressly adopted Mr. Justice White's observation in his concurring opinion in Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15, 239 (1972), that *Pierce* "held simply that while a State may posit [educational] standards, it may not pre-empt the educational process by requiring children to attend public schools." 93 S.Ct. at 2809. When the *Pierce* foundation upon which plaintiffs' first "due process" argument is based is thus removed, all that remains to support plaintiffs' argument is their reading of *Sherbert*. Indeed, *Sherbert* is the sole basis for the plaintiffs' second "due process" argument, other than a number of state cases, which are clearly inapposite.

But *Sherbert* also presented a very narrow question under the Free Exercise clause and does not support plaintiffs' argument that the receipt of a public service is unconstitutionally burdened. The Court made clear in *Sherbert* that:

> Our holding today . . . but reaffirms a principle that we an-

nounced a decade and a half ago, namely that no State may 'exclude individual Catholics, Lutherans, Mohammedans, Baptists, Jews, Methodists, Non-believers, Presbyterians, or the members of any other faith, *because of their faith, or lack of it,* from receiving the benefits of public welfare legislation.' Everson v. Board of Education, 330 U.S. 1, 16, [67 S.Ct. 504, 512, 91 L.Ed. 711]. (emphasis the Court's.) [374 U.S. at 410, 83 S.Ct. at 1797].

*Sherbert* involved a request for dispensation from a general regulatory law; not a request or demand for a public service. While the exemption or dispensation would clearly result in some aid to a particular individual, it did not involve the expenditure of state funds which would, in fact, indirectly aid a religious institution. The Court simply did not have the latter question before it. Justice Douglas appropriately pointed out in his concurring opinion, that "this case does not involve the problems of direct or indirect state assistance to a religious organization." [374 U.S. at 413, 83 S.Ct. at 1798].

In the final analysis, it must be recognized that *Sherbert* simply held that the disqualification of the Seventh Day Adventist plaintiff as a beneficiary under the South Carolina Unemployment Compensation Act could not withstand constitutional challenge because South Carolina could not justify that disqualification by a "compelling state interest in the regulation of a subject within the State's constitutional power to regulate . . .," within the meaning of the familiar standard articulated in NAACP v. Button, 371 U.S. 415 at 438, 83 S.Ct. 328 at 341, 9 L.Ed.2d 405 (1963). Braunfeld v. Brown, 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961), also involving the Free Exercise clause, represents another case in the same line of cases which reached a different result. *Braunfeld* repeatedly recognized that a valid State statute may well place an economic burden upon persons who may wish to follow their religious convic-

tions. Chief Justice Warren stated that the Pennsylvania closing law, so far as members of the Orthodox Jewish faith, "operates so as to make the practice of their religious beliefs more expensive." The Court concluded, however, that "[f]ully recognizing that the alternatives open to appellants and others similarly situated . . . may well result in some financial sacrifice in order to observe their religious beliefs, still the option is wholly different than when the legislation attempts to make a religious practice itself unlawful." [366 U.S. at 605–606, 81 S.Ct. at 1147].

*Braunfeld* makes clear that the economic effect of a statute is not an appropriate test for determining whether the challenged legislation violates the Constitution. The Court took note of the fact that "we are a cosmopolitan nation made up of people of almost every conceivable religious preference" and that "[c]onsequently, it cannot be expected, much less required, that legislators enact no law regulating conduct that may in some way result in an economic disadvantage to some religious sects and not to others because of the special practices of the various religions." [366 U.S. at 606, 81 S.Ct. at 1147]

United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), rejected a First Amendment attack upon the 1965 amendment to the Selective Service Act. Apparent limitations upon First Amendment freedoms were held to be justified by the quality of the governmental interest involved. The Court commented on the long line of cases of which *Sherbert* is only one, when it stated that:

To characterize the quality of the governmental interest which must appear, the Court has employed a variety of descriptive terms: compelling; substantial; subordinating; paramount; cogent; strong. Whatever imprecision inheres in these terms, we think it clear that a government regulation is sufficiently justified if it is within the constitutional power of the

Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest. [391 U.S. at 376–377, 88 S.Ct. at 1679]

The most recent case which, as a matter of result, fell on the same side of the line as *Sherbert,* is Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). That case concluded that the State's interest in universal education was not sufficient to justify the impingement upon the religious convictions of the Old Order Amish against formal education beyond the eighth grade. *Yoder* added to the descriptive terms used to characterize the quality of the governmental interest which must appear. Chief Justice Burger stated that "the essence of all that has been said and written on the subject is that only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion." [406 U.S. at 215, 92 S.Ct. at 1533]

We conclude without hesitation that the long established constitutional policy of the State of Missouri, which insists upon a degree of separation of church and state to probably a higher degree than that required by the First Amendment, is indeed a "compelling state interest in the regulation of a subject within the State's constitutional power," within the standard enunciated in NAACP v. Button, 371 U.S. 415, 438, 83 S.Ct. 328, 341, 9 L.Ed.2d 405 (1963), and applied in *Sherbert.* That interest, in our judgment, satisfies any possible infringement of the Free Exercise clause of the First Amendment or of any other prohibition in the Constitution of the United States. We likewise find and conclude that Missouri's interest in that subject is within Missouri's constitutional power and that such interest may properly be described as an "inter-

est of the highest order" within the meaning of *Yoder* and within the meaning of all the other various descriptive terms set forth in United States v. O'Brien above quoted.

The fact that Missouri has determined to enforce a more strict policy of church and state separation than that required by the First Amendment does not present any substantial federal constitutional question. The Supreme Court has clearly indicated that there is an area of activity which falls between the Establishment Clause and the Free Exercise Clause in which action by a State will not violate the former nor inaction, the latter. For example, Walz v. Tax Commission, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970), concluded that a State may or may not tax church property. "The limits of permissible state accommodation to religion are by no means co-extensive with the noninterference mandated by the Free Exercise Clause" [397 U.S. at 673, 90 S.Ct. at 1413]. Likewise, Tilton v. Richardson, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1972), established that a State may or may not grant funds to church-related schools for construction of buildings for secular use.

Much the same argument as that made by plaintiffs in this case was made in Di Censo v. Robinson, 316 F.Supp. 112 (D.R.I.1970), aff'd. 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1972). The Court there rejected the claim that free exercise benefits which flow from aid to parochial education should prevail over the establishment clause values protected by strict separation, stating:

We reject the notion that the Free Exercise Clause demands affirmative state action to accommodate . . . personal evaluations when society at large has accepted the premise that religious and secular education can be successfully separated. [316 F.Supp. at 123].

Missouri has determined that it will not extend bus transportation to parochial school students. Nothing in the federal Constitution requires that it do

so. Plaintiffs' arguments under the first two of the three points under discussion are untenable.

The plaintiffs' final argument under the last point of their "due process" arguments is that there is an unconstitutional taking of the plaintiff's share of tax revenues when he does not receive benefits provided from the general tax revenues. The only case cited by the plaintiffs, Detroit Edison Co. v. East China T. P. School District No. 3, 247 F.Supp. 296, (E.D.Mich.1965), aff'd. 6 Cir., 378 F.2d 225, cert. den. 389 U.S. 932, 88 S.Ct. 296, 19 L.Ed.2d 284 (1967), does not support plaintiffs' novel theory. Indeed, the district court's order dismissing plaintiff's complaint was affirmed on appeal. The general principle stated in the leading case of Union Refrigerator Transit Company v. Com. of Kentucky, 199 U.S. 194, 26 S.Ct. 36, 50 L.Ed. 150 (1905), that "a general tax cannot be dissected to show that, as to certain constituent parts, the taxpayer receives no benefit," is applicable. Plaintiffs' last argument is untenable.

## IV. CONCLUSION

We find and conclude that the Constitution of the United States does not compel the State of Missouri to provide equal transportation services to private and church-sponsored schools and that it may, as it has, elect to provide such service only for its public schools. While we recognize that some of plaintiffs' arguments may be based upon grounds other than the First Amendment, we nonetheless deem it appropriate to state that the following language from Mr. Justice Douglas' concurring opinion in *Sherbert* is generally applicable to this case:

> This case is resolvable not in terms of what an individual can demand of government, but solely in terms of what government may not do to an individual in violation of his religious scruples. The fact that government cannot exact from me a surrender of one iota of my religious scruples does not, of course, mean that I can .demand of government a sum of money, the better to exercise them. For the Free Exercise Clause is written in terms of what the government cannot do to the individual, not in terms of what the individual can exact from the government. [374 U.S. at 412, 83 S.Ct. at 1798]

Accordingly, and for the reasons indicated, it is

Ordered and adjudged that Sections 167.231, 167.251, 163.161, 163.061, 165.-011, R.S.Mo., V.A.M.S., and related statutes should be and are hereby declared not to be unconstitutional. It is further

Ordered and adjudged that the plaintiffs' demand for an injunction enjoining the enforcement of Missouri Statutes 167.231, 167.251, 163.161, 163.061 and 165.011, R.S.Mo., V.A.M.S., should be and is hereby denied. It is further

Ordered and adjudged that the plaintiffs' prayer for damages should be and is hereby denied.

COLLINSON, District Judge, concurs.

GIBSON, Circuit Judge (dissenting).

I respectfully dissent. I do not think the State of Missouri can validly claim, in the face of the Fourteenth Amendment's Equal Protection Clause, that it has a valid purpose in promoting the separation between church and state by denying bus transportation for children to church-sponsored schools. Bus transportation is furnished as a health, safety, and welfare measure to those children residing beyond a stated area of the school, and the basis and reason for such salutary service should extend to all school children attending nonprofit, accredited schools. To not do so appears narrow and insensitive of the welfare of nonpublic school attendees. Missouri formerly furnished this service and over one-half of the states now provide transportation to nonpublic, accredited schools. The furnishing on a nondiscriminatory basis of bus transportation to all would not crumble the time-honored wall of church-state separation.

388

The majority holds that the laws of Missouri "can only be interpreted as permitting transportation only to public school pupils" and that such laws do not invidiously discriminate against parochial school children. In applying the traditional test of "reasonable classification," the majority concludes that "Missouri's decision to promote the separation of church and state by refusing to provide school bus transportation to church-sponsored school pupils . . . is not irrational, but promotes a legitimate State purpose."

My disagreement with the majority's equal protection analysis is its conclusion that Missouri's decision to deny bus transportation for pupils to church-sponsored schools has a rational basis in fostering church-state separation. First, even the Missouri legislative policy does not clearly indicate that the history of bus transportation of school children in Missouri has been seen as establishing or aiding any particular religion. From 1939 to 1963, Missouri Revised Statutes § 167.140 provided for bus transportation to "pupils attending private schools of elementary and high school grades, except such schools as are operated for profit." Clearly, the Missouri legislature thought for years that bus transportation for pupils attending private and nonprofit schools did not violate the Missouri and United States Constitutions or Missouri laws. As discussed by the majority, the Supreme Court of the State of Missouri in McVey v. Harris, 364 Mo. 44, 258 S.W.2d 927 (1953), held that transportation to pupils attending private schools was prohibited by the Constitution of Missouri. However, the question remains whether furnishing bus transportation for public school children, while denying the same to church-sponsored pupils, violates the United States Constitution.

In 1947, the Supreme Court of the United States in Everson v. United States, 330 U.S. 1, 17, 67 S.Ct. 504, 512, 91 L.Ed. 711 (1947), held that the First Amendment did not prohibit "New Jersey from spending tax-raised funds to pay the bus fares of parochial school pupils as part of a general program under which it pays the fares of pupils attending public and other schools." The Supreme Court announced that it agreed with New Jersey that the spending of state funds for such bus transportation would not endanger the necessary wall between church and state as required by the First Amendment. It seems to be a strange anomaly also to say, as the defendants argue, that Missouri's denial of bus transportation for parochial pupils rationally promotes the separation between church and state. The two positions border being contradictory. Can New Jersey make a *rational* decision that bus transportation for all pupils does not endanger the separation of church and state, while Missouri takes the opposite, but supposedly also *rational* decision, that the denial of bus transportation for church-sponsored school pupils does promote the separation of church and state? Admittedly, states disagree, for 27 states do provide this questioned type of bus transportation, and 23 states do not. In light of the Supreme Court's announcement in *Everson* and, according to the policies of 27 states, I would say that the only rational decision today is that bus transportation for children to church-sponsored schools does not endanger the separation between church and state.

The factual basis for the classification between public and private school children relating to transportation is bereft of reason, relevance, and logic. In principle, though not factually, this case is similar to Rinaldi v. Yeager, 384 U.S. 305, 86 S.Ct. 1497, 16 L.Ed.2d 577 (1966), in which a New Jersey statute required unsuccessful appellants who were sentenced to jail to repay the cost of the transcript which the state had furnished. The statute did not require payment from unsuccessful appellants who were only fined or who were given probation or suspended sentences. The Court found that the purpose of the act was to reimburse the state and that the repaying of the transcript's cost by the

designated class did not have any relevance to the purpose for which the classification was made. Rinaldi v. Yeager, *supra* at 309.

Similarly, in this case the parents of church-sponsored pupils are designated as a class that does not receive the benefits of free transportation when the paying of such bus transportation costs by the parents of these children has no relevance to promoting the separation of church and state. If Missouri wanted to be entirely neutral concerning bus transportation, it would require *all* parents to pay for the bus transportation for their children, rather than providing bus transportation only for public school pupils.

Several facts are particularly bothersome and serve to demonstrate the irrationality of the classification in this contested busing field. The school bus carrying the pupils to public schools passed the Luetkemeyer children, proceeded past the Luetkemeyer's parochial school, and deboarded the public school children at their school. This absurd result certainly cannot be seriously contended as promoting a "rational" purpose of separation between church and state. The children are all citizens of the same state and country. Their parents all pay the same burdensome taxes imposed on citizens generally, and yet, because of their attendance at privately accredited schools, the Luetkemeyer children walk or use private transportation while others ride at public expense.[1] The discrimination is patent, invidious, and somewhat odious. Further, bus transportation is the safest means of transporting children to school. In view of all these above facts, to which defendants stipulated, it is difficult to perceive how the State can still argue that the denial of bus transportation for children to church-sponsored schools furthers the separation of church and state. Bus

transportation is for the benefit of children, not the establishment of any particular religion or school.

The majority emphasizes the Supreme Court's recent decision of Norwood v. Harrison, 413 U.S. 455, 93 S.Ct. 2804, 37 L.Ed.2d 723 (1973). The Court did say in dicta that a state could rationally conclude as a matter of legislative policy that "constitutional neutrality as to sectarian schools might best be achieved by withholding all state assistance." Norwood v. Harrison, *supra* at 462, 93 S.Ct. at 2809 (citation omitted). However, the Court in *Norwood* was presented with a much different factual situation than in this case. In *Norwood,* the Court held that Mississippi could not lend textbooks to school children who attended private schools that were admittedly discriminating on a racial basis. The Court noted that private schools in Mississippi had grown from 17 in 1963–64 to 155 in 1970 with a virtually all-white student enrollment. In effect, the funding of this textbook program by Mississippi was partially financing a racially discriminatory private educational system. The inapplicability of *Everson* and Board of Education v. Allen, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968), to *Norwood* concerning the providing of public assistance to sectarian schools must be viewed in connection with Mississippi's program to provide textbooks to children who were attending virtually all-white private schools that had grown nine-fold at the same time that integration was beginning to be effectively implemented in Mississippi. In the case at bar, the parents, who merely desire state-supplied bus transportation for the safety of their children, are only asserting their constitutional rights and are not attempting to further unconstitutional practices, as were the parents in *Norwood*. In addition, this service is for the benefit of the children, not the school.

---

1. The parties stipulated that bus transportation for nonpublic school children would be less than .46 per cent of Missouri's total annual expenditure for public elementary and secondary education.

I would hold that Missouri's denial of bus transportation for pupils to church-sponsored schools constitutes a clear violation of the Equal Protection Clause of the Fourteenth Amendment. Missouri does not have to furnish bus transportation at all, but having decided as a matter of state policy to furnish such transportation for the welfare and safety of public elementary and high school students, that transportation should be open to all students attending accredited schools.

The Equal Protection standard of Eisenstadt v. Baird, 405 U.S. 438, 446–447, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972), that persons standing in the same relationship to the governmental action challenged should be uniformly treated, means that children attending private schools should be afforded the same safety and welfare measures of protection in attendance as those attending public schools, no more, no less. Common justice requires it.

In giving substance and reality to the Equal Protection Clause, the Supreme Court said:

"In applying that clause, this Court has consistently recognized that the Fourteenth Amendment does not deny to States the power to treat different classes of persons in different ways. Barbier v. Connolly, 113 U.S. 27 [5 S. Ct. 357, 28 L.Ed. 923] (1885); Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61 [31 S.Ct. 337, 55 L.Ed. 369] (1911); Railway Express Agency v. New York, 336 U.S. 106 [69 S.Ct. 463, 93 L.Ed. 533] (1949); McDonald v. Board of Election Commissioners, 394 U.S. 802 [89 S.Ct. 1404, 22 L.Ed.2d 739] (1969). The Equal Protection Clause of that amendment does, however, deny to States the power to legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of that statute. A classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substan-

tial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.' Royster Guano Co. v. Virginia, 253 U. S. 412, 415 [40 S.Ct. 560, 561, 64 L. Ed. 989] (1920)."

Reed v. Reed, 404 U.S. 71, 75–76, 92 S. Ct. 251, 253–254, 30 L.Ed.2d 225 (1971).

I would hold that the Missouri statutes denying bus transportation to non-public school children are unconstitutional and issue an injunction against their enforcement.